537 So.2d 182 (1989)
United States Secret Service Special Agent John MRHA, Appellant,
v.
CIRCUIT COURT, FELONY DIVISION, In and for BROWARD COUNTY, Florida, Appellee.
No. 87-2538.
District Court of Appeal of Florida, Fourth District.
January 18, 1989.
Leon B. Kellner, U.S. Atty., and Samuel D. Armstrong, Asst. U.S. Atty., Miami, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee, Terrence J. Russell and Mimi Sall-Pritchard of Ruden, Barnett, McClosky, Smith, Schuster & Russell, P.A., Fort Lauderdale, for appellee.
LETTS, Judge.
The trial court held a Federal Secret Service agent in direct criminal contempt for revealing, during his testimony, evidence of collateral crimes after he had been instructed not to do so. We reverse.
A woman was charged in state court with violation of state tax laws after she purchased over forty thousand dollars worth of untaxed cigarettes at a tribal smoke shop on an Indian reservation. The purchases were made with stolen credit cards for which a conviction was obtained in federal court.
During a motion hearing held on the day her trial began in state court, the state's attorney gratuitously, so far as the record shows, announced that he had instructed his witness "not to mention counterfeit credit cards." To this statement, the judge responded "Okay. All righty." Defense counsel took no part in this colloquy, though he was present and undoubtedly approving by reason of his failure to comment or object. The secret service agent later found in contempt was not present at this hearing.
The trial then began and when it came time for the appellant/secret service agent to testify the following occurred:

*183 BY ASSISTANT STATE ATTORNEY:
Q. And did there come time that evening that Ms. Caradonna was arrested by yourself?
A. Yes, we did. We placed her under arrest that evening.
Q. All right. Sir, I would like to show you state's "D" composite. Sir, would you open that up, please, and look at that, sir.
A. Yes, I recognize these.
Q. How do you recognize those?
A. Those are customer copy credit card sales receipts, and various different credit card account numbers and different names, also. These imprints here are from counterfeit credit cards. I can tell from the imprint.
Q. Where did you 
DEFENSE COUNSEL: Objection. May we have a side bar?
THE COURT: Yes. Would you take the jury out, please, for a second.
Thereupon, defense counsel moved for a mistrial, but never made a motion that the secret service agent be held in contempt. Subsequently, the agent apologized to the court (several times), admitted he had been told not to mention the words "counterfeit credit cards" and said: "It slipped my mind totally. I said counterfeit credit cards when I saw the sales receipts." The agent also testified: "It was a mistake on my part. In no way did I want to sway the jury or upset this courtroom. For the last three years I have been dealing with credit card sales receipts that are counterfeit."
While inherently, it would appear that the trial judge did not believe that the secret agent's testimony was inadvertent, the judge never made a specific finding that the improper testimony was wilful or intentional. Instead, it was made abundantly clear that his understandable irritation was founded on the waste of the court's time. For example, the court stated:
1. We can't afford having a mistrial motion here. We have been wasting everybody's time for two days.
* * * * * *
2. I mean, holy mackerel, you took all this time to pick a jury and you told me you told these folks not to say anything about it. The first thing he says, those are counterfeit credit cards.
* * * * * *
3. An apology doesn't take care of the two day trial here. We are now proceeding at my peril here with the balance of this trial. The court of appeals, if she is convicted, very well can reverse the conviction. This means we wasted possibly five days of jury trial here and valuable court time, so I consider that to be more than just a simple mistake.
* * * * * *
4. "If it has, the end result of it causes people harm or causes people inconvenience and in this particular case, we are already in the second day of trial. You know, time is very important to the court in terms of the fact that I have no  I've spent two days on this particular case, and this  The statement that was made by Mr. Mrha with respect to the fact this was counterfeit would be a basis for granting a mistrial.
I chose not to grant the mistrial, and not allow the exhibits that he was being questioned with into evidence. That may very well result in the state losing the case and defendant being acquitted because those exhibits did not come in evidence.
In other words, if the defendant is convicted, you can rest assured they are going to argue that I was in error by not granting a mistrial, and her conviction may very well be reversed which would mean that all that money was spent in terms of an appeal on an error that probably should not have  Well, definitely should not have occurred, that my time would mean that I would have to try this case again, that I wasted two days on this case  Well, not two days because this whole trial is going to take, in reality, about four days.
I wasted four days on this case. If, in fact, she is convicted, the conviction is reversed  I know I am speculating here, but I am speculating with a degree of foresight. So that's where we stand here. So what I am going to do with respect to this particular offense where the defendant has been found to be in *184 direct contempt of court, I am going to order the defendant is going to have to perform, first of all, a fine of two hundred fifty dollars and order that he is going to have to perform one hundred hours of community service ... within the next four months."
* * * * * *
5. I work everyday here too, sir. I'm upset here about the fact I am, number one, wasting my time going through this effort and exercise that I am going through right now, but I have to waste the time of this court.
We begin our analysis of this matter by quoting from our Supreme Court which held that in criminal contempt proceedings, the offense must be "met and proven beyond a reasonable doubt." Williams v. Scott, 138 Fla. 239, 189 So. 274, 275 (1939). Such is a higher standard of proof than is required in civil contempt proceedings in which latter, a preponderance of the evidence will suffice. 11 Fla.Jur.2d Contempt § 61 (1979). In the case at bar, the only evidence presented was exculpatory. It is true that comments from the trial court evinced skepticism as to whether the witness could have forgotten that he was not supposed to testify as he did. We agree that the agent's credibility was for the court to decide. However, as we have already noted, the trial court's conclusion was heavily weighted towards the waste-of-time aspect rather than disbelief and we are unable to conclude that the judge found, beyond a reasonable doubt, that the agent's sworn excuses constituted perjury and that he wilfully and intentionally included the forbidden words in his testimony.
Another aspect of this case that fuels our conclusion is that no order existed for the agent to intentionally and wilfully violate. The Supreme Court case of Pugliese v. Pugliese, 347 So.2d 422, 424 (Fla. 1977), holds that a criminal contempt proceeding is predicated upon "conduct offensive to the public in violation of an order of the court." (emphasis supplied.) Indeed, at one point in the instant proceedings, the trial judge stated that the agent had disobeyed an actual order, but that is clearly not so. The trial judge's only participation in the announcement by the state attorney about counterfeit credit cards was to say "okay, all righty." That statement is not tantamount to an actual order and, in any event, the secret service agent was not present at the colloquy between the court and the state. Also, there is nothing whatsoever in the record to establish that the agent knew of a court order. See also Gilmour v. State, 358 So.2d 63, 65 (Fla. 3d DCA 1978).
In sum, we held in Department of Health and Rehabilitative Services v. State, 338 So.2d 220, 222 (Fla. 4th DCA 1976), that the alleged disobediences must be "wilful." Alternatively, we have also said they must be "intentional" though the words employed appear, in this context, to be synonymous. See American Pioneer Casualty Insurance Company v. Henrion, 523 So.2d 776 (Fla. 4th DCA 1988). In the light of all the circumstances, sub judice, we do not perceive beyond a reasonable doubt that the disobedience was a wilful or intentional violation of a court order. Moreover, it does not appear that the judgment of criminal contempt was necessary, "to vindicate the authority of the court or to punish otherwise for conduct offensive to the public...." Pugliese, 347 So.2d at 424. The secret agent was effusive in his apologies thus vindicating the authority of the court and retracting any offense to the public. As is set forth in the official Florida Judges Manual, Contempt and Conduct at Court, Section 4.17 "judges are often prone to resort to contempt as a first alternative when it should be the last. Choose a lesser sanction if possible." The awesome power to punish for contempt should be cautiously and sparingly exercised. In Re: Louis J. Weinstein, 518 So.2d 1370, 1373 (Fla. 4th DCA 1988). In the case at bar, a lesser sanction should have been imposed.
REVERSED.
ANSTEAD and WALDEN, JJ., concur.